COHEN SEGLIAS PALLAS GREENHALL
& FURMAN, PC
BY:     Melissa C. Angeline, Esquire (MA2815)
        Jonathan Landesman, Esquire (*pro hac vice*)
2 Whitehorse Pike
Haddon Heights, NJ  08035
856-301-9901
Email:  mangeline@cohenseglias.com
        jlandesman@cohenseglias.com
*Attorneys for Defendant/Counterclaimant, William Manor*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| TRICO EQUIPMENT, INC., <br>                               Plaintiff, <br><br> v. <br><br> WILLIAM MANOR, <br>                               Defendant. | CIVIL ACTION <br><br> CASE NO. 08-CV-5561 (REK) <br><br><br><br> DEFENDANT'S REPLY BRIEF <br> IN FURTHER OPPOSITION TO <br> PLAINTIFF'S MOTION <br> FOR PRELIMINARY INJUNCTION |

I.      INTRODUCTION

Prior to the hearing in this case, the parties had only a limited period of expedited discovery.  As a result, the parties' pre-hearing briefs relied primarily on pre-conceived beliefs about what they expected to transpire at the hearing.  For example, Defendant William Manor ("Manor") anticipated that witnesses for Plaintiff Trico Equipment, Inc. ("Trico") would testify, consistent with Trico's press releases and Internet site, that the company had spun off its aerial lift division to form a new corporate entity (i.e., Trico Lift), and Manor argued that, based on this anticipated evidence, Trico impermissibly assigned Manor's employment contract.  However, the record evidence did not develop as Manor had anticipated.  At the hearing, Trico produced

documents for the first time about its corporate structure, and these documents did not support Manor's assignment argument. Accordingly, Manor appropriately abandoned his assignment argument and his pre-conceived beliefs about Trico's corporate organization, and submitted a post-hearing brief based on the actual record evidence presented at the hearing.

By contrast, Trico took a very different approach in its post-hearing brief.[1] Trico continued to hold on to ***all*** of its pre-conceived notions, and urged this Court to adopt them as findings of fact. Trico did so even though many of these pre-conceived notions were not supported by the record evidence and, in many instances, were contradicted by the record evidence. Further, Trico altogether ignored the record evidence which did not comport with its pre-conceived notions – apparently hoping that the actual record evidence would somehow escape the Court's notice.

As discussed below, Trico's briefing strategy is sorely misplaced. This Court should reject Trico's misplaced attempt to recast the facts in its favor, as well as its proposed conclusions of law and request for injunctive relief that rely on the same unsupported and pre-conceived notions of the facts.

## II.     ARGUMENT

### A.     TRICO'S DEMAND FOR A TWO-YEAR NON-COMPETE DIRECTLY CONFLICTS WITH ITS ADMISSION THAT, AT MOST, ONLY ONE YEAR WOULD BE NECESSARY

In its pre-hearing brief, Trico urged this Court to issue an injunction restraining Manor from working for any competitor for a period of two (2) years. Trico presumably requested a two-year injunction at the outset because the employment agreement with Manor contained a two-year post-employment covenant. However, Trico's renewed demand, in its post-hearing brief, for a two-year non-compete restriction defies logic and the law, especially given Trico's

---

[1] Trico's post-hearing brief is entitled "Plaintiff and Moving Party Trico Equipment, Inc.'s Proposed Findings of Fact and Conclusions of Law in Support of Trico's Motion for Injunctive Relief."

open admission that only a one (1) year restriction would be necessary. At the hearing, both of Trico's witnesses, Pustizzi and Krause, testified that the two-year non-competition restriction is unreasonable and that Trico's legitimate business interests could be protected by a restricted period of only one (1) year. Specifically, Pustizzi, Trico's President and CEO, testified as follows:

> Q. Now, Mr. Manor's noncompetition agreement, we could pull it out but you and I know it's a two-year restriction. Right?
>
> A. Yes, sir.
>
> Q. And you think that you need to restrict Mr. Manor for two years? That's what you're asking this Court to do. Right?
>
> A. That's what we had in that agreement that we both agreed upon.
>
> Q. That's what you think is fair and reasonable to protect the company's interests. Right?
>
> A. What do I think is fair and reasonable? The contract says two years.
>
> Q. Do you think that two years is necessary? You're the owner of the company. Do you think you need two years to protect your business?
>
> A. To be honest with you, sir, no, I don't.
>
> Q. You could live with a shorter period of time?
>
> A. Yeah, a year.
>
> Q. One year?
>
> A. I could live with a year. If we can't develop a relationship with those customers in a one-year period, then shame on us.

(Hearing Tr., Pustizzi; 12/5/08; 128-1 to 23). Krause testified similarly, adding that one year is the "industry standard" for non-competition agreements.

There can be no doubt that Trico knows the hornbook rule that the duration of any restrictive covenant cannot be greater than is necessary to protect the employer's legitimate business interest. As shown above, Trico's President and CEO expressly admitted that a two (2)

3

year non-competition period is neither necessary nor reasonable, and that, at most, a restriction of one (1) year would be sufficient to protect Trico's interests. Given its own admissions, Trico's renewed demand for a two-year non-competition period directly conflicts with established law and its admissions, and exemplifies its strategy of ignoring record evidence in favor of "sticking to the script."

> **B.    TRICO'S ARGUMENT THAT IT DID NOT "MATERIALLY ALTER" MANOR'S TERMS OF EMPLOYMENT IS INCONSISTENT WITH ITS OWN WITNESSES' TESTIMONY AND OTHER RECORD EVIDENCE**

In its post-hearing brief, Trico does not dispute the legal principle that an employer cannot seek enforcement of a restrictive covenant if it either breaches the agreement containing the covenant or materially alters the employee's terms of employment. Indeed, permitting an employer to enforce a restrictive covenant and obtain extraordinary equitable relief *after* it has breached its obligations to the employee would be unconscionable. Here, Trico attempts an end-run around such a clearly unconscionable result by labeling its unilateral change of Manor's compensation and other employment terms as "not material." The record evidence demonstrates otherwise.

The undisputed record evidence shows that, on September 4, 2008, Trico sent a letter to Manor advising him of several changes to his terms and conditions of employment. For example, during nearly seven years of employment with Trico, Manor (like other territory managers) was given a company-issued gas card to purchase gasoline for his extensive daily travel. With the gas card, Manor did not have to make out-of-pocket cash advances to purchase gasoline, which was particularly valuable to Manor because he was driving an old SUV (a 2000 Toyota 4 Runner which did not get the best gas mileage), and because Manor had been experiencing financial difficulties and did not possess a credit card. However, in its letter dated September 4, 2008, Trico advised Manor that it was taking away his company-issued gas card,

meaning that Manor had to front the cost of gasoline for his daily travel and also that he would not be reimbursed for a significant portion of his gasoline expenses.

At the hearing, Krause specifically testified that (1) he knew that Manor was struggling financially and did not have a credit card; and (2) Manor had complained to Krause about Trico's decision to take away the company-issued gas card. (Hearing Tr., Krause, 12/18/08, 95-19 to 25.) Yet, in its post-hearing brief, Trico entirely ignored Krause's testimony, and made the blanket assertion that "Manor did not voice objection to the terms of the letter." (Trico's post-hearing brief at page 11, finding of fact 94.) Trico's own representations cannot be reconciled.

In addition, Trico argues that its unilateral decision to take away Manor's gas card as of September 4, 2008, is somehow excused by the fact that, as of February 17, 2009, the average price of gasoline in Manor's hometown of Harrisonburg, Virginia, was just $1.85 per gallon. (Trico's post-hearing brief at page 11, finding of fact 97.) This argument defies logic. As an initial matter, Trico offers no source for this alleged "fact" and it is not contained anywhere in the record evidence. More significantly, it is difficult to imagine how the cost of gasoline in mid-February 2009 is even remotely relevant to the facts of this case, given that Trico terminated his gas card on September 4, 2008, and that Manor resigned his employment with Trico on October 23, 2008. Manor respectfully submits that what is relevant – and what Trico ignores – is the undisputed witness testimony that gasoline was approximately $4.00 per gallon when Trico took away Manor's gas card in September 2008, and that Manor did not have the financial means to advance the money needed to purchase gasoline for his necessary business travel.

Trico further attempts to "explain away" its decision to unilaterally take away Manor's company-issued gas card by pointing to the fact that Trico's September 4, 2008 letter increased Manor's monthly car allowance by $415, from $800 to $1215. In so doing, Trico ignores Krause's admission that the $415 increase would not cover all of Manor's out-of-pocket gasoline

5

purchases, and that the $415 increase was not tied to the number of miles driven by Manor and/or Manor's actual gas purchases. Krause estimated that Manor's out-of-pocket gasoline costs would amount to $600 – leaving Manor with a shortfall of $185 per month. In other words, by taking away Manor's company-issued gas card and increasing Manor's flat auto allowance by only $415 per month, Trico cut Manor's pay by $185 per month.

In order to find in favor of Trico on this issue, this Court would have to ratify Trico's argument that a unilateral pay cut of $185 per month is not a material alteration of employment terms. Respectfully, it is submitted that a pay cut of $185 per month is *per se* material, and that Trico's argument if accepted would lead to a most questionable slippery slope. For example, if Trico considers a pay cut of $185 per month to be "immaterial," how large of a pay cut is required to rise to the level of "material"? Is $500 per month a "material" pay cut? How about $750 or $1,000 per month? Manor respectfully submits that the $185 pay cut unilaterally imposed upon him, as well as the requirement that he make out-of-pocket cash advances for gasoline purchases, constituted material changes to his terms and conditions of employment – especially in light of his known financial difficulties.

In this regard, it is interesting to note that, in its post-hearing brief, Trico first cites Manor's annual wages and expresses doubt concerning Manor's inability to advance cash for gasoline purchases, while at the same time urging the Court to issue an injunction against Manor on the grounds that Manor "has limited financial means [and] cannot satisfy even the most *de minimus* money judgment." (*Compare* Trico's post-hearing brief at page 28, conclusion of law 262 with Trico's post-hearing brief at page 17, finding of fact 164.) Trico cannot have its cake and eat it too.

Trico also attempts to excuse its unilateral change of Manor's employment terms by pointing to Manor's arrest for driving under the influence and arguing that Trico could have

terminated Manor.  In effect, Trico argues that it was lenient with Manor, and that he deserved a pay cut and any other punitive measures that Trico decided to make in its September 4, 2008 letter.  Trico's argument falls wide of the mark.  When Trico decided to retain Manor, it was obligated to abide by the terms of its employment agreement with Manor.  Trico's argument that it could have deemed Manor in breach of his employment agreement and terminated his employment is irrelevant.  Simply put, Trico made a business decision to continue his employment, and thus affirmed that the parties would continue to be bound by the same terms. Under any scenario, Trico was not empowered to unilaterally re-write his employment agreement by cutting his pay at least $185 per month, making other material changes, and imposing new obligations on Manor.  Yet that is exactly what Trico did with its September 4, 2008 letter.

The flaw in Trico's logic is demonstrated by a classic hypothetical:  Company promises to pay Billy $800 in exchange for Billy's promise to paint Company's office with red paint. Billy paints Company's office.  However, Company is unhappy with Billy's choice of paint. Applying Trico's logic, Company would have the exclusive right to re-write its contract and force him to accept $615 for his painting services, instead of the agreed-upon $800.  Of course, this is the wrong result.  Just as Company could not unilaterally impose a $185 deduction for Billy's painting services, Trico could not unilaterally impose a $185 per month wage cut.

Further, Trico's post-hearing brief ignores the fact that the September 4, 2008 letter subjected Manor to more scrutiny than was imposed upon any other Trico employee, including mandatory GPS surveillance, random drug testing, and a new requirement that Manor make 20 face-to-face calls with customers on a daily basis (a volume which Manor had never before achieved in his entire career as a sales representative).  Like the pay cut, these changes to Manor's employment cannot be dismissed as "immaterial."

Finally, Trico's argument that Manor did not resign his employment as a direct result of its punitive changes to the terms of employment contained in Trico's September 4, 2008 letter, is contrary to the record evidence. (Trico's post-hearing brief at page 28, conclusions of law 262 and 263.) Manor was not looking for a reason to leave Trico. The record evidence shows that Manor left Trico as a direct result of the September 4, 2008 letter unilaterally changing his employment terms for the worse. Trico's imposition of a new requirement that Manor complete at least twenty (20) face-to-face daily sales calls, while simultaneously cutting his pay and requiring him to advance cash for the gasoline needed to make these calls, was impossible to satisfy. Manor resigned his position only after Trico materially altered his employment terms. Indeed, the very fact that Manor left Trico to take a job with a reduction in pay of twenty-five percent (25%) directly supports Manor's testimony that he viewed the new employment conditions imposed by Trico as a constructive discharge and decided to leave Trico as a result.

This is not a case where Manor and Skyworks conspired to get together and take Trico's business. Rather, Trico forced Manor to resign by unilaterally imposing these new punitive terms of employment. Trico must not be rewarded for its constructive discharge of Manor by being permitted to bar him from working for another company in his chosen industry.

  **C.**  **TRICO ENTIRELY IGNORES THE FACT THAT IT BREACHED THE EMPLOYMENT AGREEMENT BY FAILING TO TIMELY REMIT COMPENSATION THAT IT ADMITTEDLY OWED TO MANOR**

As discussed in Manor's initial post-hearing brief, on December 15, 2008, nearly **two (2) months after** Manor's last day of work at Trico, and ten (10) days after the commencement of the preliminary injunction hearing in this case, Trico finally paid Manor the pro-rated portion of his final $1,215 monthly auto allowance. Pustizzi admitted that Manor was unconditionally entitled to this money, which was payable to him as wages, when he resigned on October 23, 2008. (Hearing Tr., Pustizzi, 12/5/08, 43-20 to 44-1.) There was absolutely no dispute at the

8

hearing that Trico owed these wages to Manor and failed to timely pay them. In fact, Pustizzi expressly accepted the fault and stated that he had "dropped the ball" by failing to timely pay Manor the monies owed to him. (Hearing Tr., Pustizzi, 12/5/08, 90-1 to 2.)

Remarkably, Trico's post-hearing brief is completely silent regarding its failure to pay Manor all wages owed to him until after Trico filed suit and Manor filed counterclaims demanding that he be paid all wages due him. Even assuming, *arguendo*, that Trico does not owe any additional wages to Manor at this time, the fact remains that Trico admittedly breached the employment agreement, without any justification or excuse, by withholding Manor's final pay for approximately two (2) months. This failure to pay wages owed to Manor is especially troubling, given Trico's knowledge of Manor's poor financial condition. The timely payment of all wages due an employee is perhaps the most fundament term of any employment agreement (and is embodied by state wage payment laws). Under the law, Trico's failure to timely pay Manor constitutes a material breach of the employment agreement and renders the restrictive covenants invalid and unenforceable.

### D. TRICO HAS FAILED TO IDENTIFY PROTECTIBLE INTERESTS THAT SUPPORT ITS DEMAND FOR INJUNCTIVE RELIEF

In its post-hearing brief, Trico also repeats its *ipse dixit* conclusion that Manor had access to Trico's confidential documents, including customer and price lists. However, as discussed in detail in its initial post-trial brief, these allegedly confidential documents are neither secret nor proprietary. Indeed, the record evidence shows that these same documents are distributed without restriction by Trico to its customers and/or can be re-created using sources readily available to the public.

Trico's claim that Manor's relationships with "Trico's customers" constitutes a protectable interest, is equally flawed. First, as discussed in Manor's initial post-hearing brief, the undisputed evidence shows that Trico did not enjoy exclusive relationships with any user of

its equipment, but that every project is subject to bid and can be won by Trico or any one of its many competitors. In fact, numerous of Trico's so-called "customers" were also customers of Skyworks. Second, Trico ignores the undisputed evidence that many of "Trico's customers" are actually entities with whom Manor had a relationship long before he joined Trico. (Plaintiff's Exhibit 1.) An employer cannot, as Trico is attempting to do in this case, convert an employee's pre-existing customer relationships within that industry into its own protectable interests, even if the employee is subject to a post-employment restrictive covenant.

In a case involving similar facts, *Coskey's Television & Radio Sales and Service, Inc. v. Foti,* 253 N.J. Super. 626 (App. Div. 1992), the court reversed a preliminary injunction entered against a former employee that would have barred him from using the same contacts and relationships that he brought to the employer. Like Trico, the business in *Coskey's Television* "involve[d] discrete projects, with many bids and proposals being developed which the parties realize may never result in a contract, and where the customers are a finite group dealt with by all competitors in the field." The court rejected the plaintiff's argument that a former employee must be prohibited from using his pre-existing customer relationships in the same industry after he left the plaintiff's employ, regardless of the restrictive covenant providing for the same. The court reasoned that:

> **What [employee] brought to his employer, he should be able to take away.** This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them, or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment. "Princeton is not to have the exclusive right to Einstein's services just because he is Einstein." *Corbin, Contracts,* § 1391B, at 610 (Supp.1989). **[Employee's] relationships within the industry were not bought and paid for; they were merely rented during the period of employment.**

*Coskey's Television,* 253 N.J. Super. at 637-638, (emphasis added); *see also Meadox Medicals, Inc. v. Life Systems, Inc.*, 3 F. Supp.2d 549, 553 (D.N.J. 1998) (citing *Coskey's Television*, and

refusing to preclude defendant from using pre-existing customer relationships after distributor relationship with plaintiff ended).

Moreover, Trico cannot restrict Manor from selling to twenty-nine (29) customers with which Manor had no contact and/or "no clue" of who they are, for the sole reason that he received a partial commission on sales to these customers pursuant to company policy (in that another salesman obtained an order from these customers within his assigned territory). (Hearing Tr., Manor, 12/17/08, 147-14 to 24, 148-5 to 8; Plaintiff's Exhibit 1.)  The record evidence is undisputed on this point.  In such cases, an employer has no protectable interest in those customers. *Coskey's Television, supra*; *Platinum Management, Inc. v. Dahms*, 285 N.J. Super. 274, 298, 666 A.2d 1028, 1039-1040 (Law Div. 1995) (holding that restrictive covenant was overbroad insofar as it sought to preclude prospective customers to whom the departing employee had solicited, and that covenant could only be enforced against actual customers which the plaintiff-employee had actual dealings during his employment).

### E. TRICO HAS NOT PRESENTED RECORD EVIDENCE SUPPORTING ITS NUMEROUS TORT CLAIMS, AND HAS IMPROPERLY MADE SEVERAL UNSUBSTANTIATED ALLEGATIONS AGAINST MANOR

The real issue presented to this Court is whether it should issue extraordinary equitable relief to enforce a two-year restrictive covenant against Manor.  Notwithstanding this fact, in its post-hearing brief, Trico also referenced the six (6) tort claims set forth in its Complaint as additional reasons for obtaining injunctive relief.  However, aside from reciting the hornbook elements for each of these tort claims and presenting a few unsubstantiated conclusions not in the record evidence, Trico has offered no meaningful analysis of any of these causes of action and has not presented evidence supporting a finding for Trico on any of these claims.  These claims were neither explored at the hearing nor analyzed in Trico's brief, and thus these tort claims should not be considered by the Court at this time.

Finally, it should be noted that Trico has made various unsubstantiated allegations in support of its tort claims, including the following: "The record evidence demonstrates that Defendant fraudulently induced Trico to pay Defendant for work he never performed"; "Defendant unjustly and improperly received the amounts Trico paid Defendant for time he did not actually work"; and "The record evidence demonstrates Manor improperly used his company gas credit card while employed by Trico for personal and non-business related uses and these actions were deliberate, without authorization, and at a significant expense to Trico." (Trico's post-hearing brief at page 22, findings of fact 211, 212, and 216.) Not surprisingly, none of these allegations included a reference to any of the record evidence. These blanket allegations have no support in the record evidence, and instead are mere recitations of Trico's pre-hearing allegations about this case. Trico's use of these spurious allegations in its post-hearing brief provide yet another demonstration of Trico's "strategy" of relying on unsupported allegations instead of the actual record evidence.

Similarly, Trico's allegation that Manor wrongfully failed to produce documentary evidence is, stated mildly, misguided. (Trico's post-hearing brief at page 15, findings of fact 143 and 144; Trico's post-hearing brief at page 23, findings of fact 222 and 223.) In its brief, Trico claims that Manor failed to produce documents allegedly in his possession which belong to his current employer, Skyworks, and seeks an adverse inference against Manor for his alleged failure to produce the documents.

However, Trico never propounded to Manor or his counsel a request for production of documents or any other formal discovery request pursuant to the applicable Federal Rules of Civil Procedure. To the extent that it submitted "informal" discovery requests, Trico has never filed any motion to compel Manor's production of these alleged documents. Moreover, Manor is required only to produce documents which are in his custody, possession, and control. Even

assuming, *arguendo*, that Trico appropriately propounded such a discovery request, Manor would have objected on the grounds that these records belong to Skyworks, not Manor.  Manor cannot be deemed to have custody, possession, and control of Skyworks' company records.  Given these facts, Trico's request that the Court draw some adverse inference against Manor for an alleged failure to produce these documents is improper and must be denied.

**III.   CONCLUSION**

For all of the reasons herein set forth, and for the reasons set forth in Manor's initial post-hear brief, Defendant William Manor requests that the Court enter an Order denying with prejudice Plaintiff Trico Equipment, Inc.'s Motion for Preliminary Injunction.

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, PC**

s/ Melissa C. Angeline
MELISSA C. ANGELINE, ESQUIRE (MA 2815)
JONATHAN LANDESMAN, ESQUIRE (*pro hac vice*)
2 Whitehorse Pike
Haddon Heights, New Jersey 08035
856-310-9901
267-238-4435 (fax)
Email: mangeline@cohenseglias.com

*Attorneys for Defendant/Counterclaimant, William Manor*

Dated:  March 2, 2009

## **CERTIFICATE OF SERVICE**

I, Melissa C. Angeline, Esquire, hereby certify that on this day, the foregoing Defendant's Reply Brief in Further Opposition to Plaintiff's Motion for Preliminary Injunction, was filed electronically with the Clerk of the Court using the ECF system. This document is available for reviewing and downloading from the ECF system, and the counsel below are registered ECF users.

Scott F. Cooper, Esquire
Julie E. Reid, Esquire
Blank Rome LLP
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002

*Attorneys for Plaintiff*

s/  Melissa C. Angeline
MELISSA C. ANGELINE, ESQUIRE

Dated:  March 2, 2009