(Docket Entry No. 3)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| TRICO EQUIPMENT, INC., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil No. 08-5561(RBK) |
| : | |
| WILLIAM MANOR, : | **OPINION** |
| : | |
| Defendant. : | |

**KUGLER**, United States District Judge:

Plaintiff, Trico Equipment, Inc. ("Trico") brought suit in the Superior Court of New Jersey, Cumberland County, Chancery Division, against its former employee William Manor ("Manor"), alleging (among other things) breach of an employment agreement, misappropriation of trade secrets, breach of the covenant of good faith and fair dealing, breach of the duty of loyalty, and tortious interferences with prospective economic advantage. Defendant removed the case to the United States District Court on the basis of diversity of citizenship. Plaintiff is incorporated in New Jersey and maintains its principle place of business in New Jersey. Defendant is a citizen of the Commonwealth of Virginia.

Before the court is plaintiff's Motion for an Injunction. Previously, plaintiff sought a Temporary Restraining Order. The court issued an Order to Show Cause returnable November 27, 2008. On December 5, 2008, the court issued a preliminary injunction restraining defendant from "directly or indirectly engaging in the solicitation of, servicing of, or contracting with any customer listed in Plaintiff's Exhibit 1." That Order remains in effect.

The court thereafter heard additional testimony from Kenneth Pustizzi (CEO of Trico), William L. Manor (defendant), and Edward Krause (Trico Sales Manager and Manor's immediate supervisor when he worked at Trico). At the conclusion of the testimony, counsel

submitted proposed findings of fact and conclusions of law, together with responses to their adversary's filings. The following constitutes the court's findings and conclusions pursuant to Rule 52 (c)(2).

I. **FINDINGS OF FACT**

    A. **The Parties**

1. Trico rents arial lift equipment for use indoors and outdoors, mostly for construction projects. T 12/14/08 14-14.[1]

2. Trico's corporate headquarters is located at 1101 Wheaton Ave., Millville, NJ 08332. Trico has branch locations in Beltsville, MD, Gainesville, VA, South Plainfield, NJ, Houston, TX, Plainville, CT, Marcus Hook, PA and Cincinnati, OH. T 12/5 26-24 to 27-12; P.14.[2]

3. Trico employed Manor from 2001 through October 23, 2008, as a territory manager in Virginia. Essentially he arranged for leases of Trico's equipment to customers.

4. Manor previously worked for a Trico competitor named NES, T 12/5 40-19, where he did essentially the same job.

5. Manor had a non-compete agreement with NES. T 12/5 41-13.

6. When Manor left NES to work for Trico, NES threatened to sue to enforce the non-compete agreement. T 12/5 41-17 to 42-17. Trico paid $25,000 to NES to settle the dispute and release Manor from his non-compete agreement. P.17.

    B. **The Non-Compete, Non-Solicitation and Confidentiality Agreement**

7. Trico gave Manor an offer memorandum which explicitly informed Manor he would have to sign a non-compete agreement in order to work for Trico. T 12/15 44-23; P.4; T 12/17 94-21 to 95-18. Manor understood he could not work for Trico unless he agreed to the non-complete agreement. T 12/17 95-18 to 97-18.

---

[1] "T" refers to the transcript of testimony, followed by the date, page and line numbers.

[2] "P" refers to the plaintiff's exhibits.

8. Manor signed the non-compete agreement, P.2, and a confidentiality (non-disclosure) agreement, P.3, before starting work for Trico.  The non-compete clause provided that:

> 1.   I covenant and agree that as long as I am employed by the Company, and for a period of twenty-four (24) months after termination of such employment for any reason, with or without cause, voluntarily or involuntarily, I shall not, directly or indirectly, enter into or engage in the ownership, management, operation, or control of, or act as an employee of, or consultant, advisor, or contractor to, any existing or proposed entity engaged, or planning to be engaged, in the same or similar business as the Company, if such entity competes with the Company in the same geographic area which constituted my sales territory while employed by the Company, or if such entity competes with the Company for business with regard to any customers I called on, solicited, attempted to solicit, had contact with, or became aware of during the term of my employment....

9.  The Agreement also restricted solicitation of customers should Manor leave his employment with Trico:

> 2.   I covenant and agree that for a period of twenty-four (24) months after my employment with the Company has been terminated for any reason, with or without cause, voluntarily or involuntarily, I will not directly or indirectly engage in the solicitation of, servicing of, or contracting with any person or entity which is or was a Company customer, supplier, contractor or subcontractor within two (2) years prior to the termination of my employment, for the purpose of selling goods or services in competition with the Company's business.  I further convenant and agree not to solicit or aid in such solicitation of any Company customers, suppliers, contractors or subcontractors for my own benefit or the benefit of any other person or entity during such time....

10. Manor further agreed that

> "...in the event my employment with the Company terminates, I will still be able to earn a livelihood without violating this agreement and that paragraphs 1 & 2 are material conditions to my employment or continued employment with the Company."

11. Manor agreed that his violation of the Agreement would cause "irreparable" damage to the company "for which money damages may not be adequate."  Moreover, he agreed that if he breached the Agreement "the Company shall be entitled to obtain temporary, preliminary and permanent equitable relief, without bond, to prevent irreparable harm or injury, and to

money damages .... " P.2, para. 9.

### C. The Trico-Manor Relationship

12. In the last two years with Trico, Manor reported to Edward Krause, the Sales Manager responsible for Virginia . T 12/5 46-14 to 18.

13. Manor's territory for Trico was Virginia, with an emphasis on Northern Virginia, as well as parts of West Virginia and Maryland. T 12/17 69-2 to 16.

14. Manor sold and serviced Trico equipment to Trico customers within his assigned territory for which he received a full commission (4%). He also received commissions for customers in his territory using Trico equipment outside his territory, as well as when customers from outside his territory worked inside his territory, but at a half rate (2%). T 12/17 130-13 to 131-5; 131-21 to 132-15.

15. Manor's total compensation from Trico was: 2006: $112,934.66; 2007: $106,787.62; 2008 (through October 23): $81,852. P.5. He also received a gas company credit card, an auto allowance (he used his own car), health/dental insurance and a 401K plan. T 12/18 37-11 to 39-3.

16. Trico's market share in Virginia has ranged from 7-10%. T 12/18 66-11.

17. In August, 2008, Manor was arrested after being involved in an automobile accident and charged with driving while under the influence of alcohol. T 12/5 49-22 to 50-22. Manor lost his driving privileges for two weeks. T 12/17 109-2. Loss of his ability to drive would significantly impair his ability to work, as Manor drove 225 to 300 miles per day, on average, for work. T 12/17 108-19 to 25; 156-7 to 10.

18. Though Trico had the right to fire Manor, it did not do so and let him work from home for the two weeks. T 12/17 109-3 to 12.

19. Trico put certain conditions on Manor's continued employment, reflected in a letter dated September 4, 2008. P.10. These included random drug and alcohol testing, utilization of GPS or Nextel tracking device, mandatory minimum performance standards (sales calls,

reporting and sales numbers). Trico also changed his car allowance by taking away the gasoline company credit card but increasing the monthly payment from $800 to $1,215. T 12/17 110-13 to 112-14. Krause felt Manor was "abusing" the gas credit card by, for example, buying fuel 27 times during an 18 day period in May of 2008. T 12/18 57-1 to 16. Manor agreed to these conditions, apologized to Pustizzi and thanked him for not firing him. T 12/17 109-21 to 110-5.

20. The increase in the car allowance did not depend on the cost of gas. At the time of his resignation, gasoline cost $4 per gallon where Manor lived. T 12/17 111-22 to 112-14. When the price of gas dropped, the car allowance did not decrease. T 12/18 103-17 to 104-1.

21. Developing relations with customers was an important part of Manor's job. T 12/17 101-1 to 102-2. Krause felt relationships were "paramount." T 12/18 47-24 to 48-1.

22. Price, that is what a customer pays Trico for the equipment, is only a part of this business. T 12/18 48-4. In many cases, Trico got the business even though they did not offer the lowest price. T 12/5 39-3 to 5.

23. Trico prepares a "price list" for each of its regions which is based on market conditions in that region. It is a group effort among the territory managers, sales managers and ownership of the company. The list contains specific prices for each model of equipment for a day, week or month, together with freight and fuel charges. Territory managers (such as Manor) could then negotiate with customers from those prices. The typical margin for a territory manager is a 10% discount. Though it can be 15%. To go any further the territory manager would have to go to the sales manager. The territory managers prepared customized price lists which they shared with potential customers. Though they were asked to keep it confidential, the customers could use it for any purpose they wanted. T 12/18 106-4 to 110-21.

24. Trico gave Manor confidential information about customers, including market strategies, pricing, guidelines for departing from the pricing standards, credit and other purchasing information related to specific customers, contacts at various customers and leads on

5

potential new business.  Trico supplied every sales person, including Manor, with a highly confidential list of business opportunities including analysis of various companies that Trico compiled from many sources and at significant expense to Trico.  Some of this information can be found in public sources.  Nevertheless, Trico considered it very confidential. T 12/5 35-21 to 39-5; 59-13 to 24; 103-1 to 129-16; 12/17 97-25 to 101-6; 106-23 to 107-2; 12/18 46-19 to 47-23.

### D. Dean Steel and Manor's Resignation

25. Dean Steel was a significant Trico customer.  T 12/18 10-3 to 4.

26. While still employed at Trico (shortly before his resignation) Manor recommended that Dean Steel take some of its business at a construction site to Skyworks, a Trico competitor, even though Dean had placed an equipment order with Trico.  T 12/18 13-12 to 15-4.  Manor said it was because Dean Steel was "disappointed" in Trico, T 12/17 137-16, and was unhappy with the condition of the Trico equipment.  T 12/18 23-10 to 24-2.

27. Manor never told any of his superiors that Dean Steel was dissatisfied or that he had referred a Trico customer to a competitor.  T 12/18 25-17 to 21.  Manor knew that Trico would have attempted to satisfy Dean Steel's requests had they known about them because Trico management and ownership previously made efforts to satisfy unhappy customers.  T 12/18 26-5 to 21.  Trico had expanded its fleet and would have moved new equipment to that area.  T 12/18 9-24 to 10-2.  Manor's only explanation is that he was "embarrassed" and "upset."  T 12/18 26-9.

28. Krause repeatedly tried to contact Manor when Krause learned from the Trico Gainesville service manager that Dean Steel had replaced Trico equipment with equipment from Skyworks. Manor never responded.  T 12/18 48-18 to 50-13.  Then Krause received another call from the service manager telling him that Manor's company cell phone and resignation letter were sitting on the desk at the office.  T 12/18 49-22 to 25.  Manor had in fact left a resignation letter at the Trico service center on October 23, 2008.  T 12/17 73-13 to 74-4.  He had not told Krause

or anyone else at Trico that he was resigning. T 12/17 73-16 to 18. In fact, when asked a few months previously, Manor denied looking for other employment. T 12/18 52-9.

29. Manor had erased all records of recent calls from his Trico supplied cell phone. T 12/17 74-5 to 10. He claims he was only trying to erase personal information but accidentally hit the wrong button. T 12/17 135-11 to 14; 12/18 8-1 to 9.

30. In the period around the Dean Steel problem and shortly before his resignation from Trico, Manor called the owner/operator of Skyworks 17 times on his Trico supplied cell phone. P.28. Skyworks is a direct competitor of Trico in Manor's territory (and elsewhere). T 12/5 57-13.

### E. Skyworks

31. Manor went to work immediately for Skyworks and called on or visited Trico customers. He also gave others at Skyworks information about who he called on. T 12/17 86-19 to 88-23; P.1. Manor knew that calling on Trico customers would create an issue with Trico because of the agreements. T 12/17 89-9 to 19.

32. Manor did not keep any records or journals as to who he contacted, called or visited while employed at Skyworks. T 12/17 105-8 to 19.

33. Skyworks paid Manor a salary of $75,000 per year with no commissions. T 12/17 106-11, 12/18 29-12. After a year, he expects to earn commissions. T 12/18 29-23. All the compensation details have not been worked out. T 12/18 30-14. He also received a gas company credit card, a car allowance of $800 per month, and health/dental insurance. However, he does not have any pension or retirement benefits. T 12/18 37-13 to 38-12.

34. After leaving Trico, Manor says Skyworks offered to pay his legal fees in defense of this lawsuit. T 12/18 31-8 to 15. Skyworks has not offered to pay any judgment entered against Manor. T 12/18 35-5.

### F. Miscellaneous

35. Manor did not improve his financial condition by leaving Trico and going to work for Skyworks. The reason he told the court he left Trico was because of the conditions imposed on him by Trico as a result of his arrest. Specifically, he says he could not see 20 customers or potential customers a day, though when he discussed it with Krause, he was told to "make [his] best effort on it." T 12/18 36-2 to 37-4. He also complained of the change in the fuel and car allowance. T 12/18 37-5 to 38-6.

36. Manor was not a credible witness.

37. Because of the contact information acquired while at Trico, including names of the decision makers for the customers in northern Virginia, Maryland and the District of Columbia, Manor presents a competitive threat to Trico. T 12/18 51-14 to 22.

38. Trico seeks to enforce the two year non-compete agreement. However, Pustizzi believes a one year restriction should be adequate because "If we can't develop a relationship with those customers in a one-year period, then shame on us." T 12/5 128-1 to 23.

39. Manor believes an injunction enforcing the two year non-compete would be "severe." He is married and two of their four children live with them. He has tuition payments. His wife earns about $15,000, per year. T 12/17 123-4 to 125-7.

40. Manor has held part-time jobs in the past in addition to his sales work, including satellite television installation and lawn maintenance. T 12/18 6-6 to 17. Had that company remained in business, he believes he could have earned up to $75,000 per year in the satellite television position. T 12/18 6-21 to 25.

41. Trico does not require all sales people to execute a non-compete/non-disclosure agreement similar to Manor's. Nor does it always enforce the agreements. T 12/17 5-2 to 36-5. Trico made those decisions based on its business requirements. T 12/5 61-20 to 62-2.

## II. CONCLUSIONS OF LAW

### A. New Jersey law applies

Manor and Trico agreed in paragraph 11 of the Non-Compete, Non-Solicitation and Confidentiality Agreement that it "shall be interpreted under the laws of the State of New Jersey." As a federal court sitting in diversity, this court must apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941).

New Jersey courts rely upon Section 187 of the Restatement (second) of the Conflicts of Laws in determining whether to enforce a choice of law clause. Kalman Floor Co. v. Jos. L Muscarelle, Inc., 196 N.J. Super. 16, 21-22 (App. Div. 1984); aff'd 98 N.J. 266 (1985). Neither of the Section 187 exceptions applies. New Jersey has a substantial relationship to the parties and their relationship. It is the headquarters of plaintiff. And Virginia does not have a materially greater interest than New Jersey in the determination of this case as its only connection is that it is the domicile of the defendant.

### B. Trico meets the requirements for an injunction

An injunction should be granted only if "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." Nutrasweet Co. v. Vit-Mar Enterprises, Inc., 176 F.3d 151, 153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir.1998)). Plaintiff has the burden of proving the first two factors. Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994). The court must then consider, when relevant, the third and fourth issues. Id.

#### 1. Likelihood of success on the merits.

In order to prevail on a breach of contract claim, a plaintiff must show: "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties." Hutchinson v. Del. Sav. Bank FSB, 410 F. Supp. 2d 374, 385 n.21 (D.N.J.

2006) (quoting <u>Tumi v. Excel Corp.</u>, No. 05-0477, 2005 WL 1828593, *3, 2005 U.S. Dist. LEXIS 16027 at *7-8 (D.N.J. Aug. 1, 2005)).

Here, there is no dispute there is a written contract. By working for a competitor, Skyworks, and contacting his former Trico customers, Manor clearly breached that contract. Trico has demonstrated it is damaged as a result.

Manor's claims that Trico breached the employment agreement are unavailing. The requirements imposed by Trico after the arrest did not materially alter the relationship between the parties. Moreover, Trico's actions were reasonable and accepted by Manor. Nor is there any evidence Trico failed to pay Manor everything he was entitled to.

Post-employment non-compete agreements are enforceable "where the prohibition is reasonably necessary for the protection of the business of the employer, is not unreasonably restrictive in point of time or territory upon the rights of the employee, and is not prejudicial to the public interests." <u>Solari Indus., Inc. v Malady</u>, 264 A.2d 53, 59 (N.J. 1970) (citations omitted); <u>see also</u> <u>Whitmyer Bros, Inc. v. Doyle</u>, 274 A.2d 577, 581 (N.J. 1977). ("[A]n employee's covenant will be given effect if it is reasonable under all the circumstances of his particular case; it will generally be found to be reasonable if it 'simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.'") (quoting <u>Solari</u>, 264 A.2d at 56). Where a post-employment restrictive covenant is unreasonably broad, the court may enforce it in part, to the extent that "partial enforcement is possible without injury to the public and without injustice to the parties." <u>Solari</u>, 264 A.2d at 57.

New Jersey courts recognize protecting confidential business information and protecting customer relationships as legitimate employer interests. <u>Whitmyer</u>, 274 A.2d at 581. Here, the evidence that Manor possesses confidential business information and information regarding customer relations is clear. In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive covenant. <u>Ingersoll-Rand Co. v. Ciavatta</u>, 542 A.2d 879, 892 (N.J. 1988).

As to undue hardship, courts will consider "the nature of the profession, the duration of the restriction, the geographic area of the restriction and the type of restriction." Maw v. Advanced Clinical Communications, Inc., 820 A.2d 105, 115 (N.J. Super. Ct. App. Div. 2003) rev'd on other grounds, 846 A.2d 604 (N.J. 2004). Here, both the non-compete and non-solicitation provisions apply for a two year period after employment, a period that New Jersey courts have found to be reasonable. See Community Hosp. Group, Inc. v. More, 838 A.2d 472, 484-85 (N.J. Super. Ct. App. Div. 2003) (holding two year restriction on performing neurosurgery reasonable and listing cases that have upheld two-year limitations), aff'd in part and rev'd in part, 869 A.2d 884 (N.J. 2005) (finding two-year period was reasonable but 30 mile geographic scope was not).

This non-solicitation provision bars Manor from soliciting any entity that was a customer, supplier, contractor or subcontractor of Trico, for two years. In A.T. Hudson & Co. v. Donovan, 524 A.2d 412, 416 (N.J. Super. Ct. App. Div. 1987), the New Jersey court upheld a similar provision. While New Jersey courts seem to require geographic limits for non-compete clauses, geographic limitations do not appear necessary for non-solicitation provisions. See Platinum Management, Inc. v. Dahms, 666 A.2d 1028, 1040 (N.J. Super. Ct. Law Div. 1995); Mailman, Ross, Toyes & Shapiro v. Edelson, 444 A.2d 75, 79 (N.J. Super. Ct. Ch. Div. 1982) ("To impose a geographical limitation on a covenant which seeks to protect an established clientele instead of an area of non-competition would not make the burden imposed on the employee by a covenant 'reasonable' but would merely mandate an unwarranted change in the nature of the interest protected.")

In considering whether the geographic scope of a non-compete agreement imposes an undue hardship, a court should consider "the likelihood of the employee finding work in his field elsewhere" and whether the employee ended the employment relationship, thus bringing the hardship on himself. Karlin v. Weinberg, 390 A.2d 1161, 1169 (N.J. 1978). A showing of personal hardship alone is insufficient to establish undue hardship. Id. There does not seem to be any New Jersey case which imposed a per se limit on the geographic scope that a covenant not to compete may cover, and some courts have enforced non-compete clauses with wide geographic scopes. See A. Hollander &

Son, Inc. v. Imperial Fur Blending Corp., 66 A.2d 319, 326 (N.J. 1949) (enforcing covenant "in any state east of the meridian passing through St. Louis, Missouri"); Automobile Club of Southern New Jersey v. Zubrin, 12 A.2d 369 (N.J. Super. Ct. Ch. Div. 1940) (covenant covering large portion of state unenforceable where former employer did not conduct business in some parts of this area); Community Hospital Group, 869 A.2d at 898-900 (30 mile geographic scope would not cause undue hardship to ex-employee but would be injurious to the public because ex-employee was an emergency room neurosurgeon serving a rural area); but see Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789 (N.J. Super. Ct. App. Div. 1992) (no trade secrets were involved and employee would be prevented from having any contact with any customers he worked with at his former employer, but it would be unfair to require him to uproot his family and move elsewhere to continue his employment, giving up his contacts that he had personally developed over 31 years).

Here, Manor chose to leave his job with Trico with the knowledge he had these agreements in place and that litigation was possible. He had been through similar litigation before. His personal situation, though of course grounds for sympathy, is not dispositive. He is able to work at other jobs.

The third factor, the public interest, is not a major concern. The public interest is an important consideration in "cases primarily concerned with the rights of the public to have free access to the advice of professionals licensed by the state." Coskey's, 602 A.2d at 793; see also Community Hospital Group, Inc., supra. To the extent that the public interest is considered in cases not involving licensed professionals, courts consider the demand for services offered by the employee and the likelihood that those services can be provided by others working in the area. Karlin, 390 A.2d at 1169-70. Here, there are other sales people who can provide these services in Virginia. Thus, the court concludes that plaintiff has demonstrated it will (and so far has) succeed on the merits.

### 2. Immediate Irreparable Harm to Plaintiff

The burden of establishing irreparable harm is on Trico. See Campell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992). Trico must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight, Inc.,

882 F.2d 797, 801 (3d Cir. 1989). In order to show irreparable harm, the party requesting a preliminary injunction must show more than a risk of irreparable harm; it must make a "clear showing of immediate irreparable injury." Campbell Soup, 977 F.2d at 91 (quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987)). The harm "'must be irreparable-not merely serious or substantial,' and it must be of a peculiar nature, so that compensation in money cannot atone for it.'" Campbell Soup, 977 F.2d at 92 (quoting ECRI, 809 F.2d at 226).

Trico claims that if the preliminary injunction is not issued, it will suffer immediate irreparable harm because it will continue to lose confidential information and customers to Skyworks. "Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm." Laidlaw, Inc. v. Student Transp. of America, Inc., 20 F. Supp. 2d 727, 766 (D.N.J. 1998). However a court must not presume irreparable harm based solely on a likelihood of success on the merits. Id. Where an employee solicits customers of his former employer on behalf of his new employer, there is irreparable harm. Id. at 767. Furthermore, disclosure of trade secrets causes irreparable harm. See National Starch and Chemical Corp. v. Parker Chemical Corp., 530 A.2d 31, 33 (N.J. Super. Ct. App. Div. 1987). However, if the employee has already disclosed confidential information, the harm may be irreparable, but it is not immediate. See Scholastic Funding Group, LLC v. Kimble, No. 07-cv-557, 2007 WL 1231795, at *10 (D.N.J. Apr. 24, 2007) (finding threat of disclosure moot where employee has already disclosed confidential information to former employer's competitor).

Here, plaintiff has proven it suffers, and will continue to suffer, serious irreparable injury. Manor has contacted his former customers and will continue to do so unless restrained. He (and Skyworks) benefit from the confidential information he learned working for Trico. There is no monetary compensation that can adequately measure their loss. Moreover, Manor agreed that any violation of the agreement would cause irreparable harm to Trico. See Dice v. Clinicorp., Inc., 887 F. Supp. 803, 810 (W.D. Pa. 1995) (contractual provision may constitute evidence of irreparable harm, though not dispositive).

13

### 3. Harm to defendant

Manor believes the effects on him from an injunction will be "severe." Certainly he would not be able to work for Skyworks or any other Trico competitor. However, he has other employment skills. The prohibition would be temporary. He agreed to the restrictions knowing their significance. He agreed he would be able to find other work. He knew if he left Trico to work for a competitor, he would face litigation. Therefore, any harm to Manor is essentially self-inflicted and not significant enough to deny plaintiff the relief it seeks.

### 4. Public Interest

"Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." Wright Medical Technology, Inc. v. Somers, 37 F. Supp. 2d 673, 684 (D.N.J. 1999). The public will not be harmed by enforcement of the non-compete and non-solicitation provisions of Manor's employment contract, because customers are still free to choose between arial lift companies so long as there is no improper solicitation. See id. Furthermore, enforcement of confidentiality agreements also serves the public interest. See ACE American Ins. Co. v. Wachovia Ins. Agency, Inc., No. 08-cv-4369, 2008 WL 4630486, at *9 (D.N.J. Oct. 17, 2008).

Accordingly, the court finds that plaintiff Trico Equipment, Inc., has carried its burden of proving all prerogatives for the issuance of an injunction enforcing the Non-Compete, Non-Solicitation and Confidentiality Agreement. An issue remains as to the scope and extent of the injunction. Plaintiff seeks a two year ban for both competition and solicitation. Pustizzi feels a one year ban on competition ought to be enough. As this is an equitable remedy, the court, of course, must consider all the equities of the situation. Accordingly, the court will enter an Order enjoining defendant William Manor from directly or indirectly, entering into or engaging in the ownership, management, operation or control of, or act as an employee of, or consultant, advisor, or contractor to, any existing or proposed entity engaging in or planning to engage in the same or similar business as Trico Equipment, Inc., in those geographic areas which formerly constituted William Manor's

sales territory while he was employed by Trico, for the period of one year from the date of this Order. The Order will further enjoin and restrain Manor from directly or indirectly engaging in the solicitation of, servicing of, or contracting with, or aiding any other person or entity in the solicitation, servicing or contracting with, any person or entity which is or was a customer, supplier, contractor or subcontractor, of Trico Equipment, Inc., (including, and without limitation, those entities listed in Exhibit P1) for a period of two years from the date of Manor's resignation (October 23, 2008).  Manor shall also not further disclose any confidential, non-public information to Skyworks, LLC, or any other competitor of Trico Equipment, Inc., for two years from October 23, 2008, and he shall not solicit or attempt to solicit any Trico Equipment, Inc., employee to join any Trico competitor for two years from October 23, 2008.


       /s/ Robert B. Kugler
      ROBERT B. KUGLER
      United States District Judge

Dated:   June 13, 2009